(80 Misc. Rep. 340.)

### HACKETT v. WALTER et al.

(Supreme Court, Special Term, New York County. April, 1913.)

1. LITERARY PROPERTY (§ 9*)—TRANSFER—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence in a playwright's action to enjoin the production of a play, which was the joint work of defendant and himself, *held* insufficient to sustain his contention that he had been induced by fraud to part with his interest in the play.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8; Dec. Dig. § 9.*]

2. INJUNCTION (§ 108*)—GROUNDS—CONDITIONS PRECEDENT—SALES.

Where a playwright sold his rights to a play, which was the joint work of the buyer and himself, and received the purchase money, he could not thereafter enjoin the buyer from producing the play, on the ground that he had been fraudulently deprived of his rights growing out of the joint authorship, without having first notified the defendant that he elected to disaffirm the contract and having tendered back the purchase money.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 184–186; Dec. Dig. § 108.*]

3. LITERARY PROPERTY (§ 6*)—TRANSFER—REMEDY OF SELLER.

That a playwright may have used poor judgment in selling his interest in a play, which subsequently proved very profitable to the buyer, entitles him to no relief from the courts.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 5; Dec. Dig. § 6.*]

Action by Walter Hackett against Eugene Walter and another for an injunction. Judgment for defendants.

Wise & Lichtenstein, of New York City, for plaintiff.
Nathan Burkan, of New York City, for defendants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

COHALAN, J.   Plaintiff, a playwright, brings this action to restrain the defendants from presenting the play entitled "Fine Feathers."   He asserts that the play is being produced as the individual work of the defendant Walter, but that in fact it was the joint work of Walter and himself.   In a word, the plaintiff claims that the defendants have fraudulently deprived him of his rights growing out of the joint authorship of the play.

[1, 2] The evidence does not sustain this contention.   It appears that the plaintiff wrote the scenario and theme of the play entitled "C. O. D.," and on the 17th day of November, 1910, with one Case, who was his creditor in the sum of $3,000, he transferred it to the defendant Walter.   The latter, who is a playwright, agreed to develop and adapt the play for stage representation, and to pay to Case 25 per cent. of all the royalties received from the venture.   There was an additional covenant in the agreement that the name of the plaintiff should be printed on all advertising matter as the co-author of the play.   This agreement conveyed in specific terms the entire title in the play to the defendant Walter.   As the owner thereof he was free to change, recast, and modify to any extent its contents.   He had a right to contract for the production of the play in any form he desired. After the agreement was made, Walter elaborated the dialogue, made various changes in the work, and introduced two new acts.   This play was produced by Charles Dillingham, and after three weeks of performances it was abandoned as a failure.   The Shuberts thereafter produced the play under the title of "Homeward Bound" with a competent cast.   The piece played to a losing business, and further performances were suspended.   Another attempt was made to produce it by Margaret Illington, but after three performances the play was considered impossible.   During this time it was billed as "a play by Eugene Walter, founded on a theme by Walter Hackett."   The play was then retired for over a year and a half.   In the meantime the defendant Walter turned the play from a comedy into a tragedy, and negotiated with the defendant Frazee for its production.   The defendant Walter maintains that at this stage he would do no further work on the play unless he secured a bill of sale of it from the plaintiff and Case.   On the 4th day of June, 1912, the plaintiff executed a further agreement by the terms of which he sold all his rights in the play to the defendant Walter.   This agreement, in part, reads as follows:

"The party of the second part [Walter] shall be released and discharged from all obligations under the said agreement dated November 17, 1910, to the party of the first part [Hackett], and the scenario and play and the stage versions and several titles thereof, and all the rights therein for all countries, including the publishing rights, the dramatic rights, the right to use the same for mechanical reproduction, and the right to secure copyrights and extensions and renewals of copyrights therein, and in every part thereof, shall belong to and be the absolute property of the party of the second part, free from any right, title, interest or claim of the party of the first part. And upon the payment to the party of the first part of royalties aggregating the sum of three thousand dollars ($3,000.00), the party of the first part agrees and consents that the said Frank M. Case, Jr., assigns, transfers, and sets over unto the party of the second part all contracts, accounts, and demands heretofore assigned by said party of the first to said Frank M. Case,

Jr., to secure the payment of the sum of three thousand dollars ($3,000.00) owing by said party of the first part to the said Frank M. Case, Jr., and the party of the first part agrees to assign, transfer, and set over to the party of the second part all his right, title, and interest in the above-mentioned contracts, accounts, and demands."

The plaintiff states that he read over this agreement, and that he wrote out in his own handwriting a receipt for $200 in full payment and in release of all claims which he may have had in the play entitled "Homeward Bound." The testimony shows that no fraudulent inducements were employed in the execution of this agreement. At least three failures were charged up against the play. It was entirely speculative whether the play, as changed and rewritten by Walter, would achieve the success that it afterward attained. The agreement was signed on June 4, 1912, and the play was not produced in Chicago until August 12, 1912, when in fact it did become popular. That it became a success was undoubtedly due to the ability and enterprise of the defendants. There is no dispute of the fact that the plaintiff directly and indirectly received for the play $3,200, and after the numerous failures of the play under different titles the plaintiff felt that he should dispose of it.

[3] It is not the province of this court to make a new contract for the plaintiff, nor to relieve him from the terms of a contract in the execution of which he admits that he used poor judgment. Moreover, where a party claims that he has been induced to execute a contract by the fraud of the other party, he cannot accept the benefits of the contract and then refuse to perform it on his part. It was incumbent upon the plaintiff, on the discovery of the alleged fraud, to return the benefits that he secured under the contract, and to give notice to the defendants that he elected to disaffirm the contract. Outcault v. Bonheur, 120 App. Div. 171, 104 N. Y. Supp. 1099; Hallahan v. Webber, 7 App. Div. 122, 40 N. Y. Supp. 103; Gould v. Cayuga County Nat. Bank, 86 N. Y. 75. There is no evidence in the case that the plaintiff at any time notified the defendant Walter that he elected to disaffirm the contracts, nor is there any evidence that he ever tendered back the $3,200 received. Judgment for the defendants.

Judgment for defendants.